MISSISSIPPI PUBLIC SERVICE COMM. *v.* ILLINOIS CENT. R. R. Co.

October 26, 1953

No. 38875 40 Adv. S. 64 67 So. 2d 472

532

*James T. Kendall,* Asst. Atty. Gen., Jackson, for appellant.

*Byrd, Ricketts & Wise,* Jackson, for appellee.

534

Etheridge, J.

The questions in this case stem from an order of the Mississippi Public Service Commission, appellant, directing the Illinois Central Railroad Company, appellee, to make regular or conditional stops of its two fast, interstate trains, known as the Panama Limited, at the City of Durant. We are concerned with (1) whether the Commission's findings, that Durant's passenger service is now inadequate and that public necessity requires a stop, are supported by substantial evidence; and (2) whether the effect of the order, when considered along with the above issues, unduly and substantially burdens interstate commerce.

In response to a petition by the Mayor and Board of Aldermen of Durant, the Public Service Commission held on April 17, 1952, a hearing in that city on a citation to appellee to show cause why the Panama Limited should not be required to stop there. The Panama Limited is in fact two trains, No. 5 being southbound and No. 6 being northbound, but is generally referred to in the singular. It is a fast, interstate train, running on the tracks of appellee railroad from New Orleans, Louisiana, through the

States of Louisiana, Mississippi, Tennessee, Kentucky and Illinois to the City of Chicago, and southbound on the same route from Chicago to New Orleans. It was first put on as a train on November 15, 1916, of a conventional type, powered with steam locomotives, and with running time between Chicago and New Orleans of 22 hours and 45 minutes. The train was discontinued from May, 1932, to December, 1934. In 1937 its running time was shortened to 20 hours.

On May 3, 1942, the Panama was established as a streamlined, diesel-powered train, and its running time was reduced to 18 hours. Further reductions in the running time occurred until at present it makes the route from Chicago to New Orleans and the return trip in 16 hours and 30 minutes. The Panama is an all-pullman train, constructed, designed and operated primarily and almost exclusively for interstate passengers and mail. It carries the mails under a contract with the United States Post Office Department, in which the length of the schedule is of great importance. The time of the running of these trains from Chicago to New Orleans, and return trip, is the most important element in the value of the Panama Limited. The general manager of appellee, Steve F. Lynch, testified that a short overnight trip between New Orleans and Chicago is necessary in order for the railroad to compete with the air lines and with other mail routes; that the continued shortening of the schedule from time to time over the years had occurred because of the demands of the traveling public; and that the Panama Limited runs primarily for the carrying of interstate commerce. Its principal competitor is air travel, and in order to compete with the air lines, it operates as an overnight train between terminal points.

In order to meet these public and competitive demands, the Panama Limited must maintain a close schedule. It has 20 stops between New Orleans and Chicago, five of them being conditional stops. There are 18 stations on

the Illinois Central between New Orleans and Chicago having a population in excess of that of the City of Durant and at which no stops are made by Trains Nos. 5 and 6. Five of these are in Louisiana, two in Mississippi, being Crystal Springs and Hazlehurst, three in Tennessee, and eight are in Illinois. Lynch testified that the Panama could not stop at all of these towns the size of Durant and maintain its present schedule and close timing; that this is especially emphasized here because between Jackson, Mississippi, and Memphis the appellee has only a single track, and a few minutes variation in schedule arriving time could well affect any number of trains' performances. Lynch estimated that a minimum of eight minutes would be consumed in stopping at Durant, figuring that period on the time consumed in stopping the train from a speed of 30 miles an hour, the actual period of two minutes in the station, and the time consumed for accelerating the train to 30 miles an hour. A regular stop of trains Nos. 5 and 6 at Durant would produce a yearly cost of $3,474.80, with each stop costing $4.76. In September, 1951, the Interstate Commerce Commission promulgated an order requiring appellee to make a considerable reduction in the maximum speed of the Panama on 67.7 per cent of its total route. This has materially increased the difficulty in maintaining its schedules.

The Panama consists of two deluxe all-pullman trains, with two sets of equipment, consisting regularly of four diesel locomotives, with two baggage cars, two lounges, two pullman observation cars, two parlor cars and two twin unit diners, in addition to pullman cars. The cost of that equipment was $3,808,680, and its present reproduction cost is $6,183,925.

Lynch testified that the appellee's field passenger traffic man attempted to obtain current facts and reports from the individual stations to determine whether there was sufficient traffic to warrant adjustments in the overall schedule of the road; that such a survey has been

made for Durant many times, but that the management did not think that, from the standpoint of public convenience and necessity, there was sufficient additional patronage available for the Panama to warrant a stop there, when considered against the factors of the interstate nature of the train and the length of its schedule and service; that making the stop would jeopardize the train's competition with the air lines.

In Mississippi the Panama stops at McComb, which is a terminal point for the crews at Brookhaven, Jackson, Canton, Winona, Grenada and Batesville. The distance between Canton and north through Durant to Winona is 65 miles. In addition to interstate passengers, the Panama carries intrastate passengers between points in Mississippi where the train is scheduled to stop. But Lynch stated that the Panama is designed to meet the competition at Memphis, New Orleans and Chicago. It gives the passengers a late afternoon leaving from Chicago and a reasonably early arrival in the morning at New Orleans, and vice versa, making it an overnight train. This factor is the most important element in the Panama's operation. Lynch said if the train is required to stop at Durant it would be faced with other demands to stop elsewhere also. There are no cities on the route smaller than Durant at which these trains stop. The City of Kosciusko is located 17 miles east of Durant with a population of 6,753, and the City of Lexington is 12 miles northwest of Durant with a population of 3,198; Kosciusko particularly has a number of industries.

The City of New Orleans, which goes the same route as the Panama between New Orleans and Chicago, and back, is a diesel-powered coach train, without pullmans. It operates on a day-time schedule of 16 hours and 25 minutes between its two terminal points. It makes four more stops between Chicago and New Orleans in five minutes less time than the Panama. Lynch explained the reason for this to be that the Panama has pullman and parlor

cars which are set out at Jackson, and are picked up going northward; that there is a switching crew on the Panama, and a switching operation at Memphis, but none for the City of New Orleans; and that these differences account for the additional time of the Panama.

There was introduced into evidence, over the objection of appellee railroad, a table showing the gross passenger revenue at Durant and eight other nearby stations, for the period of September, 1951, through February, 1952. Appellee's objection was based upon the fact that the gross figures shown had no probative value on the issue of the revenue received by the Illinois Central at Durant, since the figures given simply constitute the total ticket revenue on the outward bound tickets from Durant and the other named stations, but fail to state the proportion of such revenue received by appellee, and the proportion received by other railroad lines. This exhibit was admissible for whatever it would be worth to indicate the total traffic volume, but not to show the revenue earned by appellee at these points. It indicated that the total passenger revenue at Durant was in excess of that at Winona, Batesville and Canton, but somewhat less than that at Grenada and McComb.

Edward J. Meade, general passenger agent of appellee railroad, testified that appellee had made several investigations of the passenger traffic situation in Durant, and with reference to stopping the Panama Limited at Durant, "We could not determine or run down any conclusive evidence that we could present to our management that would convince them it was a convenience and necessity to have that service." The Panama has connections with all railroads out of Chicago, and two "very vital connections that would not permit of any variation of performance in that train," one of which allows one-half hour to catch a morning train leaving for the hospital and surgical center at Rochester, Minnesota, and one of which allows fifteen minutes to catch the New York

Central train going to Detroit and Battle Creek, Michigan.

Appellee operates trains Nos. 1, 2, 3, 22, 25 and 26 into and through Durant. All of them handle passengers and stop there. Trains Nos. 1 and 2 are known as the City of New Orleans, which is a deluxe streamlined coach type of train, with lounge and dining car equipment. The City of New Orleans operates from Chicago to New Orleans and back, as do trains Nos. 3, 25 and 26. Train No. 22 operates from New Orleans to Memphis, carrying passengers. The function of the City of New Orleans is to furnish a modern coach train giving a "first class service at a coach rate." It is considered as a local operation, a "train for local traffic." It operates on a daytime and not an overnight schedule. Meade testified that about a year ago the railroad made a passenger traffic survey at Durant, and that it had recently made a survey at Winona, designed to find out how many passengers got on and off the Panama at the Winona station who came from the Durant community, including Kosciusko and surrounding territory. In September, 1951, there were three passengers from Kosciusko; in October, 1951, three from Kosciusko and three from Durant; and through March, 1952, the figures averaged about on that level. No study was made of passengers from the Durant community getting on and off the Panama at Canton or Jackson.

Fourteen witnesses testified for the petitioners seeking the order. Only two of them were from the City of Durant. R. E. McNeer is the mayor of that city. He testified that if the Panama were required to make a flagstop at Durant it would better serve the people of the city than it does now. Marcus Love, a business man of Durant, who operates the Love Wagon Company, said that there were several large industries in Kosciusko; that he uses the Panama Limited four or five times a year, and that if it stopped at Durant, in his opinion it would get three

or four times more traffic from that area than it does now. Six witnesses were from Kosciusko, five from Lexington, and one from Ethel, a town of about 800 people located 27 miles from Durant, at which there is a lumber mill. A brief summary of the testimony of these witnesses for petitioners is that Kosciusko and Lexington do not have railroad passenger service; that Kosciusko is 17 miles east of Durant and Lexington is 13 miles west of Durant; that each of these witnesses uses the Panama Limited from three to six times a year, with two using it somewhat more than that; that a few of them would use it more frequently if it stopped at Durant; that at the present time in order for them to catch the Panama they must drive in their cars either to Canton, which is about forty miles away, or to Winona, which is forty-five or fifty miles from their homes; that this results in considerable personal inconvenience to them; that the City of New Orleans runs through Durant going north about noon, and going south at about 7:30 P. M., but that it is inconvenient for a business man to use the City of New Orleans, because if one is going to Chicago, for example, he has to spend two days traveling and two nights there in order to do a day's work in the City, but if he could go by the Panama Limited, an overnight train, the trip could be made in two nights of travel with only one day at the point of destination.

The order of the Commission found that the evidence revealed a substantial usage of the Panama by residents in Durant, Lexington, Kosciusko and Ethel, in Holmes and Attala Counties; that the number of passengers on such trains would be substantially increased if they were stopped in Durant; that Durant has a population of 2,311 people, Kosciusko a population of 6,753 and Lexington a population of 3,198 people; that there is a relatively high density of population and industrial development in the area involved; that the failure of trains Nos. 5 and 6, known as the Panama Limited, to stop at the City of Dur-

ant "results in inadequate public service and is unnecessarily inconvenient to the traveling public," and that "the public convenience and necessity requires and justifies the stopping of said trains" at Durant. Hence the Commission ordered appellee to stop the Panama at the regular station in Durant, beginning at a stated time, but allowed appellee the privilege at its option of making the stop a flag or conditional stop "to receive or discharge revenue passengers to or from New Orleans, Louisiana, and to discharge or receive revenue passengers from or to Memphis, Tennessee, and scheduled stops north thereof." On appeal the circuit court reversed this order of the Commission and dismissed the citation, for the reason that there was not substantial evidence to show a general public necessity, but only proof of personal convenience to a few individuals, most of whom did not live at Durant; and that the record showed that Durant is now adequately served with passenger transportation by appellee.

Miss. Code of 1942, Sec. 7815, provides that orders of the Public Service Commission shall be considered "as prima facie evidence that such determination was right and proper." In Dixie Greyhound Lines, Inc. v. Miss. Public Service Commission, 190 Miss. 704, 200 So. 579, 1 So. 2d 489, (1941), this statute was interpreted, and judicial review of a Commission order was limited to determining whether it is supported by substantial evidence or is purely arbitrary and capricious, or whether it is beyond the Commission's statutory powers, or violates some statutory or constitutional right of an interested party. We have concluded that the order in question is beyond the statutory powers of the Commission, because it results in a substantial interference with, and imposes an undue burden upon, interstate commerce in the operation of this interstate train.

Code of 1942, Sec. 7847 states: "Every railroad shall establish and maintain such depots as shall be reasonably necessary for the public convenience, and shall stop such

of the passenger and freight trains at any depot as the business and public convenience shall require.'' This is the statutory basis of the Commission's power to order the stopping of trains, where it is reasonably necessary for the public convenience and where the business and public convenience shall require. In pari materia is Code, Sec. 7783, which requires every railroad to stop its passenger trains in all county seats at which it has a depot. In Miss. Railroad Commission v. I. C. R. R. Company, 203 U. S. 335, 51 L. Ed. 209, 27 S. Ct. 90 (1906), it was held that an order of the Mississippi Railroad Commission requiring the railroad to stop its passenger trains Nos. 1, 3 and 4 at the Town of Magnolia, county seat of Pike County, was an unlawful interference with interstate commerce, and was void. Trains Nos. 1 and 3 were fast interstate trains, run on special and close schedules, and all of them carried the U. S. mails. Whether the order was valid depended upon whether the railroad had made adequate accommodations for interstate passengers by other trains which stopped at Magnolia. I. C. R. R. Company v. Illinois, 163 U. S. 142, 16 S. Ct. 1096, 41 L. Ed. 107 (1896). The court held that the railroad had furnished Magnolia with adequate interstate accommodations without requiring the particular trains in question to stop. It then said: ''The order cannot be viewed alone in the light of ordering a stop at one place only, which might require not more than three minutes, as asserted. It is the question whether these trains can be stopped at all at any particular station when proper and adequate facilities are otherwise afforded such station. If the commission can order such a train to be stopped at a particular locality under such circumstances, then it could do so as to other localities, and in that way the usefulness of a through train would be ruined and the train turned from a through to a local one in Mississippi. The legislature of a state could not itself make such an order, and it cannot delegate the power to a commission to do so,

in its discretion, when adequate facilities are otherwise furnished.''

A good, general discussion of the applicable principles is in 44 Am. Jur., Railroads, Sec. 372. ██ █ If a station has inadequate train facilities, a state may compel interstate trains to stop if necessary to render adequate train service, even though it interferes with interstate commerce. However, where the local facilities are adequate, and this is to be determined by the situation and general surroundings of the station, the obligations of the railroad are performed, and the requiring of the stopping of an interstate or mail train by a state becomes an improper and illegal interference with interstate commerce or the carrying of the mails. See also 47 C. J. S., Railroads, Secs. 418 and 421; Elliott, Railroads (3rd ed. 1922), Sec. 2544. These texts cite numerous cases so holding. In 70 A. L. R. 841, 849-853 (1931) is a detailed annotation of numerous cases holding to the same effect.

In addition to the above cited 1906 decision, other illustrative decisions, holding such orders to be invalid interferences with interstate commerce, are Atlantic Coastline Railroad Company v. Wharton, 207 U. S. 328, 28 S. Ct. 121, 52 L. Ed. 230 (1907); and St. Louis-San Francisco Railroad Company v. Public Service Commission, 261 U. S. 369, 43 S. Ct. 380, 67 L. Ed. 701 (1923). The latter case is particularly analogous to the instant one. The Public Service Commission of Missouri ordered the railroad to stop at the Town of Mountain Grove, Missouri, a southbound train, and on flag or signal a northbound train, both of which were primarily interstate trains. Mountain Grove had a population of 2,500 persons, with a trade territory of from thirty to fifty miles in radius. The trains required to be stopped were night trains operated in long distance travel. The court thought that these trains were not ''essentially contributing factors'' or adjuncts to the town's business. It held that ''interstate commerce and intrastate commerce have

different purposes and these purposes are to be considered'' together and accommodated to one another. In holding the order of the Commission an unwarranted burden upon interstate commerce, the Court said: ''Interstate commerce is concerned with the business of states, states distant often from one another, involving, necessarily, a difference in service. And such is the character of the trains in question. They are operated in long-distance traffic, are the instruments of such traffic, and it is a part of their efficiency that they are run at night. They may be a facility in some degree to Mountain Grove. It is to be remembered, however, that the city has four other through interstate passenger trains and any deficiency in their schedules or equipment can be corrected without burdening interstate commerce by stopping the trains in question. This conclusion, we think, is in accordance with our decisions.''

In Southern Pacific Company v. Arizona, 325 U. S. 761, 780, 65 S. Ct. 1515 (1945), it was held that a state train limit law, limiting interstate passenger and freight trains to a maximum number of cars, was an unconstitutional burden on interstate commerce. The Court said that ''A state may not regulate interstate commerce so as to substantially affect its flow'' or to substantially burden it; that the commerce clause has been held to invalidate state commission orders ''requiring burdensome intrastate stops of interstate trains,'' citing the cases and authorities discussed above. Morgan v. Virginia, 328 U. S. 373-380, 66 S. Ct. 1050-1055, Footnote 17 (1946), cited with approval the above discussed cases holding invalid state commission orders which materially hinder interstate commerce and which require local train service. Chicago, Minneapolis, S. P. and Railway Company v. Public Service Commission, 260 Wis. 212, 50 N. W. 2d 416 (1951), is distinguishable from the foregoing authorities, although it appears to be out of line with the general rule.

The City of Durant, with a population of 2,311 people, and with its surrounding trade territory, has six interstate passenger trains which stop daily at that station. The testimony before the Commission fails to show any public necessity that the Panama Limited be stopped at Durant, and there is no substantial evidence to support the Commission's finding of public necessity. The record indicates that several persons in the general area of Durant, at Lexington and Kosciusko, will be personally inconvenienced by the Panama's failure to stop at Durant. This is the maximum showing on behalf of petitioners. On the other hand, it appears that the Panama Limited is a train primarily designed for long-distance interstate traffic, and that it is a major part of its efficiency and value that it travels at nighttime with few stops; that the train stops in Mississippi at seven cities; and that there are eighteen cities on the route of the train which are larger than Durant at which the train does not stop.

Durant has six passenger trains of appellee stopping there each day, and all of them are in interstate commerce. And on this record there is no substantial evidence to support the finding of the Commission that Durant now has inadequate train service. It would be a facility and convenience in some degree that Durant would have an interstate night-train stopping there, so that business men in that community would not have to use a fast daytime train, such as the City of New Orleans, without pullmans, for daylight trips, or so that they would not have to drive in their cars about forty miles to another station to catch the Panama. But on the other hand these considerations must be weighed against the entirely different purposes and functions of an interstate, long-distance passenger train. The needs and interests of the hundreds of people who use each night these trains running between the states are equally a part of the public convenience and necessity to be considered.

In brief, we think that clearly the order of the Commission imposes an undue burden upon this long-distance, interstate train, and that that fact outweighs any slight disadvantage which may exist in the Durant community with reference to the personal inconveniences stated above. The Panama Limited is an instrument of interstate, long-distance traffic, and to require this and other stops of this type on this record would substantially impair its purposes, functions and efficiency, and would therefore under the above decisions unduly burden interstate commerce. For those reasons the order of the Commission involved on this appeal is invalid, and the judgment of the circuit court reversing that order and dismissing the citation of the Commission must be affirmed.

Affirmed.

*McGehee, C. J.,* and *Roberds, Lee* and *Holmes, JJ.,* concur.