**BANKS, Admrx., Plaintiff, v. BALTIMORE AND OHIO RAILROAD CO. et, Defendants.**

Common Pleas Court, Franklin County.

Nos. 190711, 190712. Decided May 28, 1957.

James F. Little, for plaintiff.

Alexander, Ebinger & Wenger, for defendant, The Baltimore and Ohio Ry. Co.

## OPINION

By GESSAMAN, J.

These two cases arose from a collision which occurred at the West Mound Street crossing of the Baltimore and Ohio Railroad Company in the City of Columbus. The collision occurred on March 8, 1954, in the early morning hours and involved an automobile driven by George Commodore and a freight train operated by employees of the defendant, The Baltimore and Ohio Railroad Company. The personal representatives of two of the passengers in the automobile filed these actions against the defendant Railroad Company and the estate of the driver, George Commodore. The only respect in which the plaintiffs claim that the defendant, The Baltimore and Ohio Railroad Company was negligent, is that it operated its train at the crossing at a speed of 25 miles per hour. This rate of speed is alleged to be negligence by virtue of two ordinances of the City of Columbus which were in effect at the time in question, namely, Section 36.2 and 36.3 of the Columbus Code of 1952. The first of these two sections limited the speed of trains at grade crossings to 8 miles per hour and the second one limited the speed of freight trains to 12 miles per hour throughout the entire city.

The second defense of the Railroad Company's second Amended Answer in each case, raises the issue of the validity of the ordinances. The Railroad Company admits the ordinances were in effect on the date in question but challenges their validity and alleges that they were unnecessary, unreasonable, discriminatory, arbitrary, and an unconstitutional burden upon Interstate Commerce.

At pre-trial it was agreed by counsel for plaintiff and counsel for defendant Railroad Company that the questions raised by the second defense of the second Amended Answers of the Railroad Company would be submitted to the Court, prior to the trial of the case upon its merits. An agreed entry to that effect was subsequently approved by the Court in each case. Subsequently in each case, counsel for the plaintiffs filed a motion to strike the second defense from the second Amended Answer. Therefore, the questions raised by the second defense in each of the second amended answers are now submitted to this branch of the court. Evidence pertinent to these questions was presented to the Court by the Railroad Company. No evidence was offered by counsel for the plaintiffs. This procedure is in conformity with that outlined by the Supreme Court in the case of **Toledo, Columbus and Ohio River Railroad Company v. Miller, 108 Oh St 388.** in the second syllabus which reads as follows:

"2. The constitutionality and reasonableness of a municipal ordi-

nance regulating the speed of trains are questions of law for the court to decide, and to justify declaring void an ordinance limiting the speed of trains within a municipality its unreasonableness, or want of necessity as a police regulation for the protection of life and property, must be clear and manifest."

The factors to be considered and the tests to be applied are not only outlined but fully discussed in the case of Cleveland, Cincinnati, Chicago and St. Louis Railway Co. v. Grambo, Sr., Adm., 103 Oh St 471. First, we call attention to the third and fourth syllabi which are as follows:

"3. An ordinance regulating the speed of trains through a municipality, enacted under the exercise of police power, which conforms to the limitations prescribed by the legislature, is presumptively reasonable and valid, and not in conflict with the state or federal constitutions. But the presumption may be rebutted, and in order to overcome such presumption a railway company must affirmatively show its unreasonableness.

"4. Where a city speed ordinance is pleaded as an element of negligence charged in a personal injury case, and the defendant by way of defense admits the existence of the ordinance, but denies its validity, setting out facts which if true would tend to show the ordinance to be unreasonable in its application to the facts of the case, the action of the court in sustaining a motion to strike out such matters is error."

Secondly, we incorporate herein the language of Judge Hough, who wrote the opinion, found on pps. 480 to 487 of the opinion:

"The validity of the ordinance is therefore raised in a number of ways. If the ordinance was valid, the court correctly charged, following the rule of law announced in the case of Schell v. DuBois, Admr., 94 Oh St 93. And further, if valid, the action of the court in sustaining the motion to strike out was properly taken. But, if the ordinance was invalid, or if the defense tendered thereto in the amended answer was good, then the charge of the court as given was improper, and the disposition of the motion was also improper, and would be the basis of error.

"The reply admits that the company is engaged in interstate commerce, operating many trains daily over its tracks, that the train figuring in the accident was so engaged and at the time en route from Cincinnati to Cleveland, through Columbus, and that the speed, according to the ordinance, could not exceed six miles per hour over grade crossings. And here it ought to be noted that the terms of the ordinance itself would permit of a broader admission on the part of the plaintiff below, relying as he does upon the ordinance, because by its terms that speed could not exceed six miles per hour, not only at grade crossings, but at all other crossings as well, and, in fact, at all points within the corporate limits of the city of Columbus, a distance of several miles; and it is the claim of the railroad company that the observance of the speed limitation of six miles per hour through the city would materially affect time schedules, particularly of the fast mail and other trains carrying interstate passengers and commerce.

"That an ordinance regulating speed, passed in the proper exercise

of the police power, in the interest of the safety and for the protection of the public, is competent evidence in a personal injury case, under the settled law of Ohio, cannot be doubted. Back in the eighties, Judge Johnson, speaking for this court in a case from the city of Bellaire, against a railway company, laid down the rule which was followed for many years, in **Meek v. Pennsylvania Co., 38 Oh St 632;** and, again, more than thirty years later, this court in another Bellaire case, reported by Judge Johnson (another Judge Johnson, of course), in **Schell v. DuBois, Admr., 94 Oh St 93,** announced a like rule so far as competency is concerned, where it is said in paragraph 2 of the syllabus:

" 'The violation of a municipal ordinance passed in the proper exercise of the police power in the interest of the public safety, and not in conflict with general laws, is negligence per se, and where such act of negligence by a defendant is the direct and proximate cause of an injury, not directly contributed to by the want of due care on the part of the injured person, the defendant is liable.'

"We come then to the reasonableness of existing ordinances as that reasonableness reflects upon constitutional provision and limitation, because it must be conceded that the ordinance is based upon statutory authority, and of course in making the test it must be made under the circumstances and conditions of the case at the present time and not contemporaneous with the passage of the original ordinance or amendment.

"Transportation problems and transportation mediums have undergone an amazing change and development since 1889. It is well to keep in mind that the public transportation agencies owe complex duties and obligations to the whole public, the passengers whom they carry and the shippers for whom they carry, and the remaining body of the general public, to the end that their operation may be conducted in such a way as to preserve the highest degree of safety and accommodation to all. Railroads have developed with the times, and with the growth and development of the country—from short line independent service, with slow schedules and long transfer waits, to the consolidated fast through service of the transcontinental lines of today. All these improvements were necessary to keep pace with the times and the demands of the public, and since the period above mentiond other transportation agencies have been created and made efficient by the master minds and industry of the nation. Electric and gasoline motor vehicles for public as well as private transportation have come into vogue and have fixed themselves permanently in the business and affairs of the country.

"In invoking the police power for the safety of the public in this state the legislature has regulated the use of motor vehicles, both public and private, and has imposed speed limits. In other than business or closely built-up sections of a municipality a maximum speed of twenty miles per hour is permitted, and although commercial motor cars have been further legislated upon the maximum speed for the greater majority of classes has not been reduced, but in some cases increased.

"The scene of this accident was near the corporate limits of the city,

so that the 20-mile limit would apply to the speed allowed the majority of motor vehicles at this point.

"Rail transportation on fixed steel tracks is concededly and normally a faster method of transportation than that of motor vehicles upon highways, with no fixed or stationary traction, yet the regulatory laws applying to these two methods of transportation differ materially, with an apparent discrimination against the rail type. There is no dearth of authority on this question, as the question has been raised in many ways and passed upon by the federal and state courts in many instances. And it would appear from a casual survey that there existed a lack of harmony in the conclusions reached. Upon careful analysis much of the inconsistency disappears. The older decisions almost uniformly hold that properly delegated police power may be exercised without limitation, so long as it is not invoked unreasonably and arbitrarily, and just as uniformly sustain the regulatory acts of the legislative bodies, for the reason, we think, that the exigencies of the cases in those earlier times were not persuasive of an unreasonable or discriminatory situation or application.

"The rule of law is in no wise different today. It is the application of the old rule to a set of facts based upon modern development of the transportation business, with the corresponding needs and demands of the public, reducing the situation surrounding the later-day cases to an unreasonable absurdity, that has led to conclusions of a different and opposite effect arrived at in the more recent decisions.

"An extremely well-considered case on the subject is that of Chicago & Alton Rd. Co. v. City of Carlinville, 200 Ill., 314, where this question is fully discussed, and a great number of the older decisions are collated and analyzed. While the holding in that case sustains the ordinance under consideration, yet the law announced is pertinent to the instant case. Proposition five of the syllabus reads as follows:

" 'The enactment of an ordinance regulating the speed of trains is an exercise of police power, and before a court can hold such an ordinance unreasonable, the want of necessity for such a measure for the public safety must be clearly made to appear.'

"And, further, proposition three announces the following rule:

" 'An ordinance regulating the speed of trains, which conforms to the limitation prescribed by the statute, is presumed to be reasonable, and it is incumbent upon the railroad company seeking to void it to show affirmatively its unreasonableness.'

"The defendant below attempted to bring itself within these rules of law by the allegations of the amended answer, in such a way as to accommodate proof tending to show the impossibility of observing the regulation and at the same time fulfilling its duties as a carrier, and to further show that the specific crossing had no peculiar elements of danger.

"The United States federal court in 1915 announced substantially the same rule as laid down in the Illinois case, supra. This appears in the case of Lusk v. Town of Dora, 224 Fed. Rep., 650, where it is said in proposition two of the syllabus;

" 'An ordinance regulating the speed of trains, enacted as an exercise of the police power of the municipality delegated to it by its charter, is presumptively reasonable and valid, and not in conflict with the federal Constitution, but the presumption may be rebutted.'

"And in proposition three of the syllabus:

" 'The reasonableness of a municipal ordinance, while a question of law, depends on the peculiar facts in each case.'

"It was held in this case that the ordinance, under the peculiar facts adduced, imposed an unreasonable burden on interstate commerce.

"A decision of the United States supreme court rendered in 1917 very well illustrates the trend of modern decisions upon the question under consideration. In Seaboard Air Line Ry. Co. v. Blackwell, 244 U. S., 310, under the peculiar facts put before the court in that case, the following announcement of the law was made:

" 'That provision of the "Blow-Post" law of Georgia (Civil Code, 1910, Sec. 2675-2677), which requires railroad companies to check the speed of trains before public road crossings so that trains may be stopped in time should any person or thing be crossing the track there, is a direct and unconstitutional interference with interstate commerce as applied to the state of facts specifically pleaded by the defendant interstate carrier in this case, whereby it appears that, to comply with the requirement, the interstate train in question would have been obliged to come practically to a stop at each of 124 ordinary grade crossings within a distance of 123 miles in Georgia extending from Atlanta to the South Carolina line, and that more than six hours would thus have been added to the schedule time of four hours and thirty minutes. Southern Railway Co. v. King, 217 U. S., 524, distinguished.'

"We are persuaded that if in the trial of the case before us the defendant had been permitted to develop the issuable facts set out in the amended answer there would have been presented for solution of court and jury a different situation, and following the line of decisions above mentioned we reach the conclusion that the trial court erred in its ruling on the motion to strike out the matters appearing in the amended answer, and that the charge of the court in respect to the validity of the ordinance, as that validity is reflected by its reasonableness or unreasonableness in this case, while consistent of course with its holding on the motion, nevertheless constituted prejudicial error. * * *"

The litigation in that case arose out of an accident at a grade crossing in the City of Columbus which occurred on October 17, 1917. At that time an ordinance of the City of Columbus purportedly limited the speed of trains over crossings at grade to six miles per hour. The opinion of the Court in the Grambo case was written in 1921 but the conclusions reached therein were of equal if not of greater force in 1954 than they were in 1921.

Following the rule in the Grambo case is the case of **Weiler v. Pennsylvania Railroad Co., 64 Oh Ap 411.** At **page 413** of the opinion the Court spoke as follows:

"The court, after hearing evidence upon the reasonableness of a

city ordinance providing for a six-mile speed limit for railroad trains, excluded the ordinance. In this, the court committed no error. The court followed the procedure prescribed in **Cleveland, Cincinnati, Chicago & St. Louis Ry. Co. v. Grambo, Admr., 103 Oh St 471**, 134 N. E., 648, 20 A. L. R., 1214. * * *"

Counsel for the defendant Railroad Company have favored the Court with the opinion of Judge Kloeb, given in 1950 in the unreported case of Bryant, Administratrix v. The Baltimore and Ohio Railroad Company, No. 6116 in the District Court of the United States for the Northern District of Ohio, Western Division. In that case the Railroad Company had raised the question as to the validity of an ordinance limiting the speed of trains to six miles per hour. Judge Kloeb had before him, of course, both the Miller and the Grambo cases, supra. At one point in his opinion he says:

"The Court is impressed particularly with this fact: trucks, competitors of the railroad, are permitted to pass up and down Milan Road at a speed of thirty-five miles per hour; that is, they may go that speed or anything under. Automobiles may travel thirty-five miles per hour, and yet at a railroad crossing where a train propels itself, it must, under the ordinance, go six miles or less per hour.

"The Court is inclined to say that this is an unreasonable and unnecessary limitation as regards the public safety."

This comment is particularly applicable to the question presented to this Court as we shall later point out. Again, in the opinion Judge Kloeb says:

"The Court is inclined to believe and does believe that the exercise of this power by the municipality under an ordinance enacted in 1883, at a time when the horse and buggy were the only method of transportation along Milan Road, that such a limitation of six miles per hour on the part of the railroad in moving its trains is unreasonable and unnecessary for the public safety. The horse and buggy of those days could travel, when the horse is trotting, about eight miles per hour."

His conclusion is summarized in these words:

"For the purpose of this case the Court will rule that the ordinance is unreasonable and unnecessary for the public safety."

The evidence in the case at bar discloses that Section 36.2 of the Code of the City of Columbus of 1952 had its origin in an ordinance of February 4, 1889, which restricted the speed of trains at crossings to six miles per hour. This undoubtedly was the same ordinance which was considered by the Supreme Court in the Grambo case although the enacting date of the ordinance as disclosed in that case does not conform to the evidence in this case. Nevertheless it was enacted in 1889. In 1919 the limit was raised to eight miles per hour and it remained at that limit for approximately thirty-six years when in 1955 it was repealed and the speed limit at grade crossings was fixed at forty-five miles per hour.

Section 36.3 of the Columbus Code of 1952, according to the evidence, first appeared in the 1930 Columbus Code and by its provisions it limited the speed of freight trains to twelve miles per hour. This section like-

wise was repealed in 1955 and the speed limit was fixed at forty-five miles per hour.

We refer to the history of these two sections and the length of time during which the old ordinances had been in effect because of the fact that the changing conditions to which Judge Hough referred in the Grambo case were far more pronounced in 1954 than they were in 1921 when the Grambo opinion was written. Some of the changed conditions are apparent when we review the physical characteristics of the crossing in question as it existed on March 8, 1954.

On that date a single track of the Baltimore and Ohio Railroad Company crossed West Mound Street near the westerly limits of the City of Columbus at grade. West Mound Street extended in a general easterly and westerly direction and the railroad track in a general northerly and southerly direction. The evidence further discloses that the crossing was level and extended the entire width of West Mound Street. At that point the street was approximately forty feet wide from curb to curb. Approaching the crossing from the west there was an unobstructed view north along the track for a distance of 2005 feet from a point 55 feet west of the west rail and there was an unobstructed view of 2615 feet in the same direction from a point 30 feet west of the west rail. These are the directions in question in this case.

The evidence discloses that the crossing was protected by signs and signals on each side of the track. On each side of the crossing was a post with two signs, one a cross-arm sign bearing the warning "Railroad Crossing" and the other a reflectorized sign bearing the warning "Stop on Red Signal." On each post were four (4) electrically operated automatic flasher lights, two (2) facing east and two (2) facing west. The lights were electrically operated and each alternated 22 flashes to a minute. They were actuated by southbound trains reaching a circuit point 2640 feet north of the crossing, or by northbound trains reaching a circuit point 3187 feet south of the crossing. These lights continued to flash until the crossing was completely free of any train. The flasher signals were in operating condition at the time in question. With these precautions we can see no valid reason for requiring a train to slow down to either eight or twelve miles per hour before crossing West Mound Street at this point.

Counsel for the Railroad Company also contend that the evidence discloses that these two ordinances placed an unreasonable burden on Interstate Commerce.

The evidence discloses that the track in question was part of a main line running from Cincinnati, Ohio, through Columbus to Wheeling, West Virginia. Three symbol freight trains and two passenger trains travelling in each direction, crossed West Mound Street each day, as well as a local freight train. The symbol freight trains carried perishable commodities, livestock and a wide variety of products, all of which had delivery dates which had been guaranteed by the Railroad Company. The average symbol freight train travelling through Columbus at that time contained eighty cars and the normal running time for such trains from Cincinnati to Wheeling was approximately ten hours. The evidence discloses that to operate a symbol freight train through Columbus at

the rate of either eight or twelve miles per hour, it would have been necessary to have stopped that train at the city limits, keep it stationary for a period of approximately four minutes in order to adjust the air in the brakes in each of the cars, and then start again and accelerate to the speed required by ordinance. At a speed of eight miles per hour the loss of time through the City of Columbus alone would have been 71 minutes and 30 seconds. At a speed of twelve miles per hour, the loss of time through the City of Columbus alone would have been 43 minutes and 30 seconds. This delay in Columbus alone would have seriously affected connections with other freight trains going east from Wheeling, West Virginia, and going west from Cincinnati, Ohio. Therefore, either delivery dates or schedules would of necessity have to be changed. A large percentage of the cargo on the symbol freight trains was destined for points west of Cincinnati and east of Wheeling, West Virginia. Testimony was submitted to the Court concerning the effect of train schedules if similar speed limits had been imposed in all cities and villages through which the trains passed from Cincinnati to Wheeling and vice versa. We shall not indulge in a discussion of this evidence. Suffice it to say that it would have materially altered both schedules and delivery dates. It is the opinion of the Court that both of the ordinances in question placed unreasonable burdens upon interstate commerce.

It is also contended by counsel for the Railroad Company that the provisions of the two ordinances in question were discriminatory. The evidence discloses that by ordinance of the City of Columbus in effect at the time in question, the prima facie lawful speed for motor vehicles, including many trucks, was thirty-five miles per hour. Furthermore, it is alleged in the pleadings that there were traffic signs on the south side of West Mound Street for several miles regulating the speed of automobiles approaching the crossing at not more than thirty-five miles per hour. In view of this we concur in the conclusion of Judge Kloeb to which we have already referred.

Counsel for the Railroad Company also point out that it was virtually impossible for the Railroad Company to comply with the provisions of the sections in question in view of the so-called "blocking" ordinance. At the time in question there was in effect an ordinance of the City of Columbus which prohibited the blocking of any crossing by a moving freight train for a period longer than two minutes. The evidence discloses that the average symbol freight train could not comply with that ordinance at either eight or twelve miles per hour. The train involved in the accident in question carried 55 cars, much less than the average symbol freight train of eighty cars. The 55-car train would require two minutes and forty-five seconds to cross the West Mound Street crossing at twelve miles per hour and four minutes and seven seconds travelling at eight miles per hour. The situation here presented is similar to that in the case of City of Cincinnati v. Luckey, 85 Oh Ap 463. Pertinent to the contention of counsel in the case at bar, is the language of Judge Ross found at pages 468 to 470 of the opinion:

"The same considerations, however, involve the second claim of defendants, that is, that the effect of these two ordinances, Sections

410-8 and 410-26, is an attempted regulation of interstate commerce. Any limitation placed on the length of a train engaged in interstate commerce, imposed by a counsel of a municipal corporation, would obviously be an interference with interstate commerce. The Supreme Court of the United States has held such a limitation beyond the power of a state and obviously such limitation would be beyond the power of any political subdivision thereof. Southern Pacific Co. v. Arizona, ex rel. Sullivan, Atty. Genl., 325 U. S. 761, 89 L. Ed. 1915, 65 S. Ct. 1515, the second paragraph of the syllabus of which is

" 'The Arizona Train Limit Law (Arizona Code Ann., 1939, Sections 69-119), making it unlawful to operate within the state a passenger train of more than fourteen cars or a freight train of more than seventy cars, held, as applied to interstate trains, invalid as contravening the commerce clause of the federal Constitution.'

"By application of the two ordinances, every train is required to clear the crossing in ten minutes, and yet no train is permitted to travel faster than ten miles per hour, or 60 minutes, or a mile in six minutes. This means that the longest train which could lawfully pass in ten minutes would be a train one and 4/6th miles long or, as a mile is 5,280 feet, a train 8,800 feet long. The average length of a freight car is approximately 50 feet, so that any freight train containing more than 176 cars could not pass the crossing in ten minutes, and such operation would violate the provisions of Section 410-8 of the ordinances, and if the train went faster than ten miles an hour in order to clear the crossing, such operation would violate the provisions of Section 410-26 of the ordinances.

"Considering the two ordinances together, which the Municipal Court was required to do and as this court is required to do, since it must take judicial notice of that of which the trial court took judicial notice, we must conclude that the effect of the ordinances is an interference with interstate commerce, and, under the circumstances existing in these cases, cannot be enforced against the defendants."

This case was affirmed on other grounds in **153 Oh St 247.**

There is no question but that the Council of the City of Columbus had the authority to regulate the speed of trains through the city. §723.48 R. C. Such regulations are presumed to be reasonable and valid. (Syllabus 3 of the Grambo case, supra.)

"* * * to justify declaring void an ordinance limiting the speed of trains within a municipality, its unreasonableness, or want of necessity as a police regulation for the protection of life and property, must be clear and manifest." Syllabus 2 of the Miller case, supra.

We have reviewed the evidence in some detail for the purpose of pin-pointing the more important phases of the evidence presented to the Court which, in our opinion, clearly and manifestly disclose the unreasonableness and want of necessity of the ordinance in question. As applied to the grade crossing in question and at the time in question, it is the considered opinion of the Court that the evidence clearly and manifestly discloses that the ordinances at that time and with respect to the West Mound Street crossing were unnecessary, unreasonable, dis-

94

criminatory, arbitrary and an unconstitutional interference with and burden upon interstate commerce and are, therefore, for the purposes of this case, invalid. It follows, therefore, that the motion in each case made by counsel for the plaintiff to strike the second defense of the Second Amended Answer in each case is, and each of them is, overruled.